## THE WILLIAM B. MURRAY et al.

(District Court, D. Rhode Island. January 29, 1917.)

No. 1359.

1. MARITIME LIENS ☞24, 25—SUPPLIES—CONSTRUCTION OF STATUTE.

Act June 23, 1910, c. 373, § 1, 36 Stat. 604 (Comp. St. 1913, § 7783), which gives a maritime lien to "any person furnishing repairs, supplies or other necessaries * * * to a vessel * * * upon the order of the owner," gives no authority for the creation of a maritime lien, except upon the vessel to which the supplies, etc., are furnished, and an agreement by an owner that certain vessels should be charged with a lien for coal to be furnished to other vessels can have no effect to create a maritime lien which would take precedence of an existing mortgage.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 20, 30–36.]

2. MARITIME LIENS ☞43—SUPPLIES—WAIVER OF LIEN.

Under such statute the right to a lien is not affected by the fact that bills for supplies were made out and charges made to the owner, or that notes were given, unless there is satisfactory proof of an intention to waive the lien.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 82.]

3. MARITIME LIENS ☞35—SUPPLIES—CONSTRUCTION OF STATUTE.

One who furnishes supplies for the use of a number of vessels of the same owner, for which he is entitled to a maritime lien under the statute, cannot select one or more from such number, and enforce the lien against them for the entire amount.

4. MARITIME LIENS ☞27—SUPPLIES—COAL FURNISHED FOR USE OF FLEET.

A contract for coal to be furnished by libelant to a corporation, which owned a fishing fleet and also fish-packing plants, made with the knowledge by libelant that the corporation was largely indebted, but with the understanding that the coal was to be used in large part by the vessels, and in view of libelant's statutory right to a lien therefor, was a contract to furnish coal to such vessels, within the meaning of the statute, and the lien became fixed and definite when any of the coal was appropriated to a vessel, although it was all delivered on a wharf, and distributed to the vessels by the owner as required.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 41–45.]

5. MARITIME LIENS ☞17—SUPPLIES—CONSTRUCTION OF STATUTE.

Act June 23, 1910, c. 373, § 1, 36 Stat. 604 (Comp. St. 1913, § 7783), giving a maritime lien for supplies furnished to vessels, in view of the facts that in the ordinary course of business supplies for the general requirements of an entire fleet of vessels operated under a common management are contracted for at one time, and that supply men will thus be called upon to furnish supplies in advance of the arrival of the vessels, and there may be uncertainty as to which vessel will require them or use them, should be given a construction which will make it applicable to and consistent with such business conditions.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 20, 22.]

6. PAYMENT ☞39(8)—APPLICATION—APPROPRIATION BY CREDITOR.

A payment, not applied at the time, cannot be subsequently applied to a note not then due, rather than to a matured account secured by a maritime lien, where such application would be to the prejudice of another lienholder.

[Ed. Note.—For other cases, see Payment, Cent. Dig. § 113.]

In Admiralty. Libels by the Piedmont & George's Creek Coal Company to enforce maritime liens against the fishing steamers William B. Murray, and others; the Atlantic Phosphate & Oil Corporation, claimant. Decree for libelant in part.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Kirlin, Woolsey & Hickox, of New York City, and Frank Healy, of Providence, R. I. (John M. Woolsey, Cletus Keating and H. Brua Campbell, all of New York City, of counsel), for libelant.

Gardner, Pirce & Thornley, of Providence, R. I., for claimant.

Ł⁰OWN, District Judge. The Piedmont & George's Creek Coal Company seeks to establish maritime liens for coal supplied under contracts with the Atlantic Phosphate & Oil Corporation, which, in 1913 and 1914, was the owner of a fleet of 19 fishing vessels, and of lands and fish factories at Promised Land, Long Island, and at Tiverton, R. I. All this property was mortgaged to the Astor Trust Company of New York, as trustee to secure an issue of bonds.

The coal was sent in five shipments. The first, 911 tons, May 19, 1914; the second, 922 tons, May 23, 1914; the third, 1,187 tons, June 9 1914; and the fifth, 1,439 tons, July 3, 1914—were all delivered at Promised Land. The fourth shipment, 861 tons, June 20, 1914, was delivered at Tiverton, R. I. The invoices and manifests were, in each instance, made out to the Oil Corporation, and the name of no vessel belonging to the Oil Corporation was mentioned.

At the time of the delivery of the first shipment at Promised Land there were already in bins on the pier 1,068 tons of coal which had been paid for, and the four cargoes were dumped on the same pile. Coal from these bins was used by the Oil Corporation, both for the operation of its fleet of 19 vessels and for running the boiler plant at Promised Land. The coal delivered at Tiverton, R. I., was unloaded on the pier, and subsequently was used in part by 10 of the Oil Corporation's vessels and in part by the boiler plant on shore.

All of these deliveries were charged on the books of the Coal Company against the Oil Corporation, and there were no entries charging any of the coal against specific vessels.

Act June 23, 1910, c. 373, 36 Stat. 604, provides:

"That any person furnishing repairs, supplies, or other necessaries, including the use of dry dock or marine railway, to a vessel, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."

The principal question is whether the evidence shows that the Coal Company, libelant, was a "person furnishing supplies to a vessel," within the meaning of the statute.

The documentary evidence in the case—the books of the Coal Company, the original invoices, etc.—is in the ordinary form which would be used in supplying coal to a purchaser at his dock or pier, without regard to its subsequent use by the purchaser.

Defendants' Exhibits 8 and 9 are as follows:

Exhibit 8.

New York City, May 28, 1914.

Atlantic Phosphate & Oil Corporation, No. 165 Broadway, New York.

Attention of Mr. T. C. Meadows.

Gentlemen: This is to confirm agreement for the furnishing of your coal requirements at Promised Land and Tiverton, for the current season, coal to be invoiced as follows:

10,000 tons our best grade George's Creek Cumberland coal on basis of $3.10 gross ton, New York loading piers.

Balance of your requirements for this grade of fuel to be filled on basis of $3.05 gross ton, New York loading piers.

All the Piedmont, or our second grade of George's Creek, to be billed on basis of $2.75 gross ton, New York loading piers.

This is not a formal contract, but is as per the writer's understanding with you a few days ago.

Yours truly,                    Piedmont & George's Creek Coal Co.,
SJB/BB                              S. J. Bohannon, Manager Sales.

### Exhibit 9.

New York, N. Y., May 28, 1914.
Piedmont & George's Creek Coal Company, 30 Church Street, City.

### Attention Mr. S. J. Bohannon, Manager Sales.

Gentlemen: This will acknowledge your favor of the 28th, confirming our agreement relative to our requirements of coal at Promised Land and Tiverton for the coming season.

The prices mentioned by you in this letter are in accordance with our understanding of the agreement and are satisfactory.

If at any time you wish a more formal contract than this letter, we shall, of course, be glad to supply it.

Yours very truly,              Atlantic Phosphate & Oil Corporation,
TCM/A                                      By T. C. Meadows.

These letters, which were intended as an informal memorandum of the agreement, contain no reference to the furnishing of coal for any particular use, and no reference to a lien.

Long after the five shipments had been delivered, and after checks for the same had been protested, legal proceedings against the Oil Corporation were threatened by the Coal Company, to avoid which it was agreed that the entire amount of coal furnished should be charged against the Oil Corporation's best five boats, as a security for the claim. The headings of the original invoices, in possession of the Oil Corporation, in which the charges were against the Oil Corporation, were torn off, and new headings were pasted on, charging coal to each of the five selected vessels and owners. This appears by libelant's exhibits: Number 2, dated September 11, 1914, and No. 3, dated September 15, 1914.

The intention of this arrangement was to give security upon five selected vessels for the coal already delivered to the owners.

There is nothing in the documentary evidence relating to prior dealings which, in terms, shows a specific agreement for a maritime lien for these five shipments.

The Oil Corporation went into the hands of receivers in October, 1914, and the Coal Company filed petitions, which were based upon the subsequent arrangement of September, 1914, rather than upon the original agreement, which preceded the delivery of the coal.

When the present case was brought on for hearing, the libelant took the position that the parties, by agreement, might create a maritime lien on such of the vessels as they might select, irrespective of the amount of coal actually furnished to or used by these vessels. Upon expressions of doubt by the court as to the soundness of this contention in point of law, the libelant filed a libel against seven other vessels.

The case presented by the consolidated libels is much complicated by the artificial mode in which it is presented. Instead of giving a plain narration of fact, the five original libels are artificially framed, and are based rather upon the agreement made for the prevention of litigation than upon the original agreement made for the furnishing of the coal. Oral testimony was presented at the hearing to the effect that, as there was still a balance due for the previous year, and as the Oil Corporation was known to be largely indebted, an oral agreement was made that for coal furnished the Coal Company should have a maritime lien upon the entire fleet of the Oil Corporation.

I am of the opinion that the testimony shows that before the writing of the letters, Exhibits 8 and 9, the financial ability of the Oil Corporation to pay was discussed, and that it was understood by the contracting parties that the law would afford a lien upon the vessels for the coal, and that the Coal Company would thus have security. It was also understood by the parties that a large part of the coal furnished was to be used by vessels of the fleet.

[1] The statute of June 23, 1910, gives no authority for the creation of a maritime lien on vessels to which coal was not to be furnished. An agreement that certain vessels should be charged with a lien for coal furnished to other vessels could have no effect to create a maritime lien which should take precedence of an existing mortgage. Even if the Coal Company expected that it was to get security upon the entire fleet, irrespective of what use should be made of the coal, this was an erroneous conception of legal rights. However, it seems just to hold that the parties contracted in view of the fact that the statute afforded a right to a maritime lien, and that, even if they misconceived the extent of this right or the mode of its enforcement, the libelant may be entitled to such a maritime lien as may arise under the statute upon the facts of the case.

[2] That bills were made out and charges made to owners, or that notes were given, does not destroy the lien given by the act of June 23, 1910. The parties must be presumed to have contracted with so important a provision in mind; and though it might be a defense that the lien has been waived, we should require satisfactory and definite proof of such intention in order to deprive the libelant of such security as may be afforded by the statute.

As it appears from the testimony that the contract covering the coal in question was made at a time when it was known to the libelant that the Oil Corporation was still in arrears for coal for the preceding year, and was otherwise heavily indebted, and that receivership proceedings were contemplated, it is quite clear that the libelant had no intention to waive any of its legal rights to a maritime lien.

In The Patapsco, 13 Wall. 329, 20 L. Ed. 696, it was said concerning the condition of the company which owned a line of steamships, and which was hopelessly insolvent and was borrowing large sums on mortgage:

"It would be strange if the libelant did not know this condition of things, and, in the absence of proof on the subject, it is a reasonable inference that he did. If he had this knowledge, it would be a violent presumption to suppose

that he relied on the credit of the company at all for the supplies which he furnished."

In the present case there is proof of the libelant's knowledge.

It may be said, therefore, that the parties contracted, knowing that a large portion of the coal was to be used for a strictly maritime purpose, and in reference to such legal rights as existed under the United States statute.

[3] As has been said, the theory of the libelant in filing his five original libels was that a contract for a lien on the fleet would permit the libelant to select any vessel for the enforcement of the entire lien, irrespective of the amount of coal furnished to that particular vessel.

The libelant cites Freights of The Kate et al. (D. C.) 63 Fed. 707; The Erastina (D. C.) 50 Fed. 126; The Advance, 72 Fed. 793, 19 C. C. A. 192; The Patapsco, 13 Wall. 329, 20 L. Ed. 696; also the recent case of The John L. Lawrence (D. C.) 231 Fed. 507. In the latter case the learned judge remarked:

"I can perceive no valid reason why, unless for some other cause the libelants are deprived of a maritime lien, they may not have filed their libel upon each of the steamers for the entire amount and recovered the whole amount out of either of them."

Without considering this case in detail, it may be observed that this dictum of the learned judge is not in accord with the decisions in this circuit.

In The Kearsarge, 1 Ware, 546, Fed. Cas. No. 7,634, upon a consideration of a lien statute of Maine, it was held by Judge Ware:

"If the owner is building two vessels at the same time, and materials are furnished generally for both, the materialman has a lien on both the vessels, and may enforce it against either of them."

This case, on appeal (The Kiersage, 2 Curt. 421, Fed. Cas. No. 7,762), was reversed in an opinion by Mr. Justice Curtis, who said:

"I am unable to concur in so much of this opinion as holds that the statute gave a lien on both vessels for all the materials furnished, without regard to their use on one or the other. The statute in terms, for materials furnished for or on account of any vessel, gives the creditor a lien on such vessel for his materials. These terms do not give a lien on one vessel for materials furnished for or on account of another vessel, nor for or on account of it and another. The natural meaning of the words is that, for the price of materials furnished for a particular vessel, the creditor shall have a lien on that vessel. I do not think myself at liberty to give what is called a liberal construction to these terms, so as to embrace in them a case they do not describe."

The language of the Maine statute (Rev. St. 1841, c. 125, § 35):

" * * * Or furnish materials, for or on account of any vessel, building or standing on the stocks, or under repairs," etc.

—so far as the question before us is concerned, seems quite similar to the act of June 23, 1910.

The learned justice also used the following language, which seems to be directly applicable to the case before us:

"At the same time, I think that, where materials are furnished for two specific vessels, though the original contract does not appropriate them specifically to either, yet when they are afterwards appropriated, they may

properly be considered as furnished for that vessel, in the construction of which they are used. The effect of such a contract is to enable the builder to elect to which of the two vessels he will appropriate them. When he has made that election, and actually appropriated them or some part of them to one vessel, I can see no sound reason why it may not be said with truth that they were furnished for and on account of that vessel, and so that the case is within the terms of the law."

This case was followed in Berwind-White Coal Mining Co. v. Metropolitan S. S. Co. (C. C.) 166 Fed. 784. Judge Putnam, considering a single contract for machinery for two steamers, the Harvard and the Yale, held that, where there is a joint sale of materials, a lien cannot be maintained on any one vessel for the entire materials furnished for both vessels, but said that this was not inconsistent with the allowing of a lien after ascertaining what benefit each steamer received under the contract:

"The underlying equity is that the lien is supported by the fact that the labor and materials have actually gone into the property on which the lien is claimed, and increased its value."

This case on appeal (American Trust Co. v. W. & A. Fletcher Co. [Berwind-White Coal Mining Co. v. Same] 173 Fed. 471, 97 C. C. A. 477) was affirmed. Although the case was thoroughly contested by eminent counsel experienced in the admiralty law, the ruling of the court below that the furnishing of the materials removed any uncertainty arising from the fact that the contract was joint, so far as an examination of the briefs in that case discloses, was not questioned on appeal. In the opinion on appeal (173 Fed. 479, 97 C. C. A. 477) it was said also:

"The contract of construction was made with reference to the statute, and a verbal incorporation of the statute into the terms of the contract, expressing in the language of the parties that which the Legislature has declared to be the law, must be an empty formality."

[4] I find, therefore, that in contracting for this coal it was understood by both parties that it was to be principally used for strictly maritime purposes, that a large part of it was used for such purposes, and that the parties contracted in view of statutory rights to a lien.

It may be argued that when coal is delivered to bins on the wharf of a purchaser, who may use it as he pleases, on such of his ships as he may select, or upon land, if he prefers, that the coal is furnished to the owner and not to a vessel. But such an argument upon the evidence in this case ignores the material fact that it was understood by both parties that the coal was procured and supplied largely for uses which were strictly maritime.

Doubtless a very substantial part of the inducement to the Coal Company to supply the coal was its knowledge of its intended use by vessels for maritime purposes, and its understanding that the law gave it a lien for coal supplied for such purposes. Upon the facts in this case it is most improbable that the coal would have been supplied to the owner and upon the owner's very doubtful credit.

I find that it was furnished because it was destined and intended to be used in large part by vessels, and that in the sense of the statute it was therefore furnished to vessels upon the faith of a lien thereon, and not to the owner.

The ultimate destination to vessels, and the use by vessels, being a material consideration, contemplated by both parties, it would be most unjust to the libelant to hold that it furnished the coal to the owner, and only on the owner's credit. The mere fact that the names of the particular vessels to receive particular shipments of coal were unknown I cannot regard as material. The Oil Corporation was known to be the owner of a fleet of vessels, and it was known that those vessels would call from time to time at the Oil Corporation's wharves for their coal. That is sufficiently certain which, in the due course of the contemplated supply of coal to the fleet, would be made certain.

The subsequent appropriation of the coal to particular vessels by the owner, being in pursuance of what was intended by both parties, logically relates to the question whether the coal was furnished by the libelant to a vessel. The course of the business of the owner's fishing fleet selected and made certain which of the vessels should receive the benefit of the libelant's coal and become subject to a maritime lien corresponding to the benefit received. A contract to provide coal for such vessel of a fleet as might first arrive in port, and the delivery of coal ready at the owner's wharf for such vessel, would become definite on the arrival of the first vessel of the fleet.

[5] As supplies for fleets of vessels under a common ownership and management in the ordinary course of business are contracted for in view of the general requirements of the entire fleet, as supply men will thus be called upon to furnish supplies in advance of the arrival of the vessels, as at the time supplies are ordered there may be uncertainty as to which vessel may require them and use them, the statute should receive a construction which will make it applicable to and consistent with modern business conditions. A supply man who furnished supplies ready for any vessel of a fleet that may call for it should not be deprived of the same right to a lien as a supply man who is told the name of the vessel which is to require the supplies.

The appropriation of the coal to a particular vessel, though made by the owner, yet if done in pursuance of the course of business contemplated by the parties, must be regarded as completing a "furnishing" by the libelant to "a vessel," which is identified by the act of the owner in placing the coal aboard.

Cases which hold that supplies may be furnished to a vessel, though not actually incorporated in or used by the vessel, have no bearing in this case. While use and appropriation may not, in all cases, be necessary to make out a case of furnishing to a vessel, it does not follow that they may not afford conclusive evidence of the identity of a vessel and of the completion of a maritime lien thereon.

But the question of the effect of an appropriation to a particular vessel I regard as settled by the decisions of Mr. Justice Curtis and Judge Putnam, heretofore cited. In these cases it was at the outset uncertain which of two vessels might receive the supplies. In the

present case it was uncertain which vessels of a fleet might receive them; but in this case, as in the cases cited, the uncertainty ended upon the owner's appropriation of the coal to special vessels.

Following the decisions of Justice Curtis in The Kiersage, 2 Curt. 421, Fed. Cas. No. 7,762, and of Judge Putnam in Berwind-White Coal Mining Co. v. Metropolitan S. S. Co. (C. C.) 166 Fed. 784, I am of the opinion that for such coal as actually went into any vessels of the fleet the libelant is entitled to a maritime lien upon such vessel, but that there can be no lien upon one vessel for coal supplied to another vessel. See, also, The Yankee, 233 Fed. 919, 927, 147 C. C. A. 593.

According to the evidence of Mr. Milligan, manager at Tiverton, out of the entire fourth shipment of 861 tons, 790 tons were thus received by vessels of the fleet, and a record was kept of the amounts received by the respective vessels. The agreed price was $3.75 per ton.

There were shipped to Promised Land 4,459 tons of coal, at an average price of $3.28 per ton. Vessels of the fleet received from bins at Promised Land 3,568 tons, and a record is presented of the amounts received by particular vessels. Some uncertainty arises, however, from the fact that the 3,568 tons were taken from bins at Promised Land which contained, not only the 4,459 tons of coal furnished under the contract, and for convenience called by counsel "lien coal," but also 1,068 tons of coal that had been paid for. The entire amount of coal on hand was,

> 4,459 tons lien coal, so called.
> 1,068 tons nonlien coal.
> _____
> 5,527 tons.

If we should deduct from the 3,568 tons received by the vessels the whole amount of 1,068 tons of nonlien coal, it would follow with mathematical certainty that 2,500 tons of lien coal were used by vessels of the fleet. Upon this view of the case, it would seem that there should be deducted from the amounts furnished each steamer at Promised Land a part of 1,068 tons proportionate to the whole amount received by a particular vessel. But it hardly is just to assume that all of the 1,068 tons of nonlien coal went to the vessels. The confusion of lien coal and nonlien coal cannot be treated in the same light as a confusion of goods by a tort-feasor, against whom every assumption will be made. The Idaho, 93 U. S. 575, 585, 23 L. Ed. 978.

The proportion of nonlien coal, 1,068, to the whole amount in the bins, 5,527, is less than one-fifth. For practical purposes a deduction of 20 per cent. from the amount received by each ship would seem to give a result that would be fair and as accurate as the nature of the case admits.

I am of the opinion that the libelant is entitled to liens upon the respective vessels, the amount thereof to be determined upon the principles above stated. Any objection to the mode of computation, or to the accuracy of the figures, may be heard upon the settlement of the terms of the decree.

[6] There remains a question as to the application of a payment to the Coal Company of the sum of $2,000, made on or about August 24, 1914.

At this time the Coal Company held notes of the Oil Corporation that were not yet due. The book account for the five shipments of coal for which a lien is now claimed was then due. After the receivership of October 19, 1914, this payment was credited upon one of the notes, which had been renewed after the receipt of the check for $2,000.

To so credit the amount after the receivership would result in prejudice to the mortgagee by subjecting the property to a maritime lien to the amount of about $2,000.

I am of the opinion that this payment should be applied to the open account, rather than to the notes not due at the time of payment, and that the claim for maritime liens must be reduced by the amount of the payment of August 24, 1914, either by a pro rata reduction or by the extinguishment of the claims upon certain vessels, as shall hereafter be determined.

Counsel for the libelant may present a draft decree, within 20 days, in accordance with the above opinion; and objections to and corrections thereof may be filed within 10 days thereafter.