ASTOR TRUST CO. et al. v. E. V. WHITE & CO., Inc., et al.

(Circuit Court of Appeals, Fourth Circuit. February 6, 1917.)

No. 1486.

1. MARITIME LIENS ⬳1—NATURE AND GROUNDS.

    The basis of a maritime lien is the equitable right, springing from the necessities of commerce, to hold a vessel for something done or furnished to the vessel itself, which enables it to continue in service, and without which its earning power would be greatly reduced, if not destroyed.

    [Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 1.]

2. MARITIME LIENS ⚓35—SUPPLIES—AGREEMENT FOR LIEN.
     The owner of two or more vessels used in a common service cannot,
     as against a prior mortgagee, by a verbal agreement subject them to a
     joint and several lien for supplies furnished indiscriminately to all of
     them, without attempting to segregate or identify the portion designed
     for any particular vessel, so that each of them will be bound for sup-
     plies furnished to the others, even though it receives none itself.

Appeal from the District Court of the United States for the Eastern District of North Carolina, at Wilmington; Henry G. Connor, Judge.

Suit in admiralty by the Weller Coal Company against the steamer John W. Lawrence and others. From a decree (231 Fed. 507) distributing proceeds of the Lawrence to E. V. White & Co., Incorporated, and the Robert P. Voight Company, lien claimants, the Astor Trust Company, trustee under mortgage, and others, appeal. Reversed.

Ralph L. Collett, of New York City (Sullivan & Cromwell, of New York City, and Herbert McClammy, of Wilmington, N. C., on the brief), for appellants.

Robert P. Ingram and Henry Bowden, both of Norfolk, Va., for appellees.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

KNAPP, Circuit Judge. The facts are undisputed and may be thus summarized: In September and October, 1914, the appellees, E. V. White & Co. and the Robert P. Voight Company, both mercantile corporations, were wholesale dealers in groceries, machinery, and marine supplies at Norfolk, Va. The Atlantic Phosphate & Oil Corporation, a New York concern, was the owner of the steam fishing vessels, John L. Lawrence, Portland, Nat Strong, and Adroit, which were chartered to the Carolina Coast Products Company, a corporation of which one Bussells was president and general manager, and engaged in fishing in and about the port of Wilmington and the coast of North Carolina for the joint benefit of the owner and charterer. It became necessary for these vessels to have certain supplies, which the charterer was unable to procure in Wilmington on account of its poor financial condition, and application was made to the appellees to furnish what was needed on credit. This they were willing to do, if they could have a lien on the vessels for the merchandise furnished.

Thereupon Bussells, for the charterer, and one Ingram, for the appellees, conferred with the officers of the Atlantic Phosphate & Oil Corporation in New York, where an agreement was made that the charterer, the Carolina Coast Products Company, would execute notes to the appellees for the supplies which they were to furnish, and that they should have a maritime lien for the same on all the steamers, "singularly and as a whole." Notes were given accordingly, each of which was indorsed with the names of all the vessels, and also indorsed by Bussells and a Mr. Meadows. These notes aggregated $2,000, the amount of supplies which it was then estimated the vessels would immediately require. As it was understood that additional supplies would be needed from time to time, the owner further agreed that appellees should have a lien on all the vessels, singularly and as a whole,

for such additional supplies as might be furnished, and the names of the vessels were to be put upon any additional notes that might be given therefor by the charterer.

Relying upon this agreement for a lien on each and all of the vessels, White & Co. furnished supplies to the amount of $516.35, and the Voight Company to the amount of $1,638.66, all of which were necessary to continue the vessels in operation. None of this indebtedness was paid by the charterer, and the notes were subsequently surrendered by the appellees. As to the delivery of these supplies the special master found as follows:

"That upon the execution of said notes, as aforesaid, Mr. Ingram and Capt. Bussells returned to Norfolk, where the said notes were delivered by Capt. Bussells to the Voight Company and White & Co., respectively, and they delivered the supplies as called for to the Carolina Coast Products Company at its factory, and said company distributed them to the several steamers."

"That all of said supplies were not used by steamer Lawrence, not as much as $819.33; the steamers had used about one-fifth each of the supplies furnished, and the factory one-fifth, and there was on hand $500 worth, when the libels were filed against said steamers, which supplies went into the hands of the receiver of the Carolina Coast Products Company."

"That neither White & Co. nor Voight Company had any knowledge that the supplies were intended for use otherwise than by the steamers. The supplies were shipped by White & Co. and the Voight Company in a commingled lot, and they believed that the supplies would be distributed to the steamers. The supplies were invoiced to the steamers by name, care of the Carolina Coast Products Company."

After all four of the steamers had been libeled by other parties, each of the appellees filed two intervening libels, one against the steamer Lawrence for half its claim, and one against the Portland for the other half. Under decrees of the court below all of the vessels were sold, but only one of them, the Lawrence, brought enough to pay more than the prior claims for wages. From the sale of the Lawrence, however, a surplus was realized of some $7,000, from which surplus the appellees were ordered paid the amounts of their several libels against that vessel, and no appeal was taken from this order. Thereupon the appellees filed amended libels against the Lawrence, or the funds resulting from its sale, for the other half of their respective claims; and this appeal is taken from the decree which sustained the amended libels and directed payment of their several amounts out of the fund mentioned.

Upwards of a year before any of these transactions, in July, 1913, the Atlantic Phosphate & Oil Corporation had executed to the Astor Trust Company, as trustee, a mortgage upon certain properties then owned by it, including the four vessels above named, to secure a large issue of bonds. In December, 1914, suit was brought to foreclose this mortgage and a decree of sale entered in March of the following year; but "the aggregate amount realized by the trustee on the sale of all the mortgaged properties was less than the amount of the mortgage and less than the amount due and unpaid on said bonds." It will thus be seen that the question here is the right of the bondholders, or their representative, to the moneys which the decree below has awarded to the appellees; and this question must be dealt with as one of general

maritime law, since the appellees do not base their contention upon any statute, federal or state.

It is virtually conceded by appellants, and we shall assume, that at the meeting in New York everything was done that the owner and charterer could do by parol agreement to give the appellees a maritime lien upon all the vessels, "singularly and as a whole," for the necessaries furnished. It is equally clear and undisputed that appellees have already had from the proceeds of the Lawrence more than the value of any supplies which were used by or delivered to, or even intended for, that particular vessel. The appellees, therefore, solely by virtue of their contract with the owner, claim a maritime lien upon the Lawrence, to enforce which their second libels were filed, not for supplies furnished to the Lawrence itself, but for supplies furnished in fact to the other three vessels. Can the claim be sustained?

[1] Nearly 100 years ago, Mr. Justice Johnson, speaking for the Supreme Court in The St. Jago de Cuba, 9 Wheat. 409, 416 (6 L. Ed. 122), said:

"The whole object of giving admiralty process and priority of payment to privileged creditors is to furnish wings and legs to the forfeited hull to get back, for the benefit of all concerned; that is, to complete her voyage."

And this figure of speech expresses the central idea of a maritime lien, namely, the equitable right, springing from the necessities of commerce, to hold the vessel itself for something done or furnished *to it* which enables it to continue in service, and without which its earning power would be greatly reduced, if not destroyed. It is the needful and saving benefit to the res which gives the right to proceed in rem. On no other basis can that right be supported. And this conception of the essential nature of a maritime lien pervades the whole range of statute law and judicial utterance upon the subject. For example, in 26 Cyc. 787, the principle is summed up as follows:

"The basis of a lien for necessaries is a benefit rendered the vessel. Hence, in order for such lien to arise, the necessaries must be either delivered on board the vessel or brought into immediate relations with her, as by being delivered on the wharf or into the custody of some one authorized to receive them."

And this is but a paraphrase of the oft-quoted statement in The Vigilancia (D. C.) 58 Fed. 698:

"There can be no delivery to the ship, in the maritime sense, whether of supplies or of cargo, so as to bind the ship in rem, until the goods are either actually put on board the ship, or else are brought within the immediate presence or control of the officers of the ship."

[2] But this principle, long accepted and familiar, seems clearly to refute the contention of appellees that the owner of two or more vessels, used in a common service, may by verbal agreement subject them to a joint and several lien, "singularly and as a whole," for supplies furnished indiscriminately to all of them, without attempting to segregate or identify the portion designed for any particular vessel, so that each of them will be bound for supplies furnished to the others, even if it receives none itself, and that such a lien will be good as against a prior mortgagee whose mortgage is duly recorded. We

cannot assent to the proposition. It is plainly at variance, in our judgment, with the fundamental idea of a maritime lien; nor has it ever been recognized, so far as we are aware, in the general maritime law of the country, or in any legislative enactment. Indeed, as we read the reported cases, they are all of contrary import. A few citations will suffice.

The following from Munn v. The Columbus (D. C.) 65 Fed. 430, indicates the facts involved, and holds that a joint lien cannot be maintained:

"The libelant has proceeded on a supposed joint lien against the several vessels attached, for the entire contract price of all the services separately rendered to these vessels, and to others not attached which were engaged in the same work. The proceeding is anomalous; no precedent for it is to be found in the history of admiralty jurisprudence. It is doubtless an experiment suggested by the libelant's necessities. The dredging company having failed to keep its contract and being insolvent, the libelant must lose compensation for his services unless he can establish a lien such as he sets up. He might have kept an account with each vessel, and have proceeded against her separately for it, but looking evidently, to the dredging company alone for payment, he failed to do this. Now, to overcome the difficulty, he seeks to treat all the vessels as one, and supposes he may do so, because they were engaged in the same work, and thus hopes to recover his entire claim for the services rendered to all from such as he has been able to catch. That he cannot do this seems plain."

The case of The Knickerbocker (D. C.) 83 Fed. 843, arose under a statute of New York, but that statute was merely declaratory of the general maritime law. The court said:

"The theory of the libel seems to be that this fleet of boats should be treated as one vessel, and, the supplies in question having been bought for the fleet (although used on some of the vessels, and not on others), this gives the libelant a lien therefor upon all of the vessels jointly. This proposition cannot be maintained."

Directly in point, as it seems, is The Newport, 114 Fed. 713, 52 C. C. A. 415, the syllabus of which says:

"A joint lien cannot be enforced against a dredge and a number of scows used in connection therewith for towage services rendered to all the vessels, although they were rendered under a single contract."

The opinion in this case cites with approval The Columbus, supra, and quotes therefrom the following:

"To sustain this libel would be to apply the law of admiralty lien in a manner for which there is no precedent. The cases cited for the appellant do not support his contention."

And in The Alligator, 161 Fed. 37, 41, 88 C. C. A. 201, 205, decided by the Third Circuit Court of Appeals in 1908, it was said:

"The charges against the separate dredges were arbitrarily made upon statements of service, not to the dredges singly and separately, but to them as grouped. It would be an abuse of the administration of the law of maritime lien to decree a lien for services not clearly proved to have been entirely maritime and rendered to the particular res upon which the lien is claimed. A lien does not, and should not, attach for a supposed credit given to a vessel, unless the service or supplies are clearly shown to have been rendered or furnished to the particular vessel to which the credit is given."

The appellees refer us to a number of cases, among them The Kalorama, 77 U. S. 204, 19 L. Ed. 941, and The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710, which hold that the owner may by contract express or implied, create a maritime lien for necessary supplies furnished to his vessel, even in the home port. This is undoubtedly the established rule of law, but it seems clearly without application. None of these cases touches, much less desides, the question here presented, namely, whether the owner can, even by express agreement, give a joint and several lien upon two or more vessels which will hold either of them, not for supplies furnished to it, or intended for its use, but for supplies furnished to the others, and which lien will be good as against a prior mortgagee. For that contention we find no authority. Indeed, in all the cases cited, it appears either that the supplies were in fact furnished to the particular vessel sought to be charged, or that the decision was put distinctly on the ground of estoppel, as in The Worthington, 133 Fed. 725, 66 C. C. A. 555, 70 L. R. A. 353, where the dispute was solely between owner and libelant, and no rights of third parties were involved. Even in The Wyoming (D. C.) 36 Fed. 494, the court said:

"Furthermore, if money is advanced to aid in running two steamboats, no lien can be allowed against either unless the proof shows how much was advanced on behalf of each, and for what purpose it was used."

We therefore conclude that the appellees' claim in this case cannot be sustained, and are the more content to so decide because of our disposition to restrict rather than enlarge the scope of secret liens.

The decree appealed from is reversed, and the cause remanded for further proceedings in accordance with this opinion.

Reversed.