## THE WALTER ADAMS.

SEABOARD FISHERIES CO. v. PIEDMONT & GEORGES CREEK COAL CO.

(Circuit Court of Appeals, First Circuit. June 21, 1918.)

Nos. 1327–1332.

1. MARITIME LIENS ⬤⟹26—CONTRACT BASIS OF LIEN.
   A contract cannot afford the necessary basis for a maritime lien, unless it is maritime in its nature as to all its provisions, so as to be cognizable in admiralty.

2. ADMIRALTY ⬤⟹14—JURISDICTION—"MARITIME CONTRACT."
   Admiralty has no jurisdiction over breach of a contract to furnish owners of 19 fishing steamers such coal as the 19 vessels might require during the season; such contract not being maritime in character, in that it did not begin and end in the necessities of a particular vessel for her own voyage.
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Maritime Contract.]

3. MARITIME LIENS ⬤⟹27—COAL—CONSTRUCTION OF STATUTE—"SUPPLIES FURNISHED TO VESSELS."
   Under Act June 23, 1910, giving a maritime lien for "supplies furnished to vessels," a lien does not attach to a vessel because of coal used by such vessel, where the coal, instead of being delivered to the vessel, was part of large quantity of coal delivered to the owner, to be used by any of its 19 fishing steamers; the owner determining the vessels to use the coal, the amount to be used by each vessel, and time of putting it on board—the coal, under such circumstances, not having been supplies furnished to a vessel.

4. MARITIME LIENS ⬤⟹27—SUPPLIES FOR DESIGNATED VESSEL.
   Where specific supplies have been furnished to owner upon distinct understanding that they were for specified vessel, and owner, after delivery to him, has appropriated them to designated vessel, supplies have been furnished to vessel, within Act June 23, 1910, giving maritime lien for supplies furnished to vessels.

Appeal from the District Court of the United States for the District of Rhode Island; Arthur L. Brown, Judge.

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Libels by the Piedmont & Georges Creek Coal Company to enforce maritime liens against the fishing steamer Walter Adams and certain other fishing steamers; the Seaboard Fisheries Company, claimant. Decrees for libelant, and claimant appeals. Reversed, and cases remanded, with instructions to dismiss libels.

See, also, 240 Fed. 147.

Rathbone Gardner, of Providence, R. I., and Philip L. Miller, of New York City (Charles R. Haslam and Gardner, Pirce & Thornley, all of Providence, R. I., and Sullivan & Cromwell, of New York City, on the brief), for appellant.

John M. Woolsey, of New York City, and Frank Healy, of Providence, R. I. (Harry D. Thirkield, of New York City, on the brief), for appellee.

Before DODGE, BINGHAM, and JOHNSON, Circuit Judges.

DODGE, Circuit Judge. Maritime liens, asserted by the libelant company upon each of the vessels proceeded against in these cases, for amounts of coal alleged to have been furnished to them respectively during the fishing season of 1914, have been sustained as valid by the District Court. The claimant appeals from the decrees, contending that upon the facts proved the libelant acquired no maritime lien upon either of said vessels.

There is little or no dispute as to the material facts. They are for the most part sufficiently set forth in the opinion below. The William B. Murray et al., 240 Fed. 147.

The libelant had no dealings regarding the furnishing of coal with either of the vessels libeled, through their officers in command; nor did any of its dealings with their owner regarding the coal it claims to have furnished relate to coal required at the time for use by either of said vessels, or to either of said vessels as distinguished from the other vessels included with them in a "fleet" of nineteen fishing steamers in all. Its dealings were only with the then owner of the entire fleet, referred to in the opinion below as the "Oil Corporation," which corporation was employing the fleet, in connection with lands and fishing factories belonging to it at Promised Land, on Long Island, in New York, and at Tiverton, R. I., in a manufacturing business. At the two above-named places the vessels of the fleet delivered fish taken on their successive trips, and also coaled for further trips.

The libelant did not deliver any of the coal it claims to have furnished directly to the vessels libeled, or either of them; nor does it appear to have delivered any of said coal to the Oil Corporation directly, either at Promised Land or at Tiverton. The coal for which it claims liens came to those places in five different shipments, on various dates in May, June and July, 1914. Four of said shipments were delivered, as the opinion below states, at Promised Land, and one at Tiverton. But all the shipments came to those places on barges which had taken the coal on board at the libelant's loading piers near New York City, where the libelant had agreed to deliver it under a previous general agreement with the Oil Corporation so to deliver such coal

as said corporation might require for its needs at Promised Land and at Tiverton, during said season, at agreed prices per ton; the delivery of all the coal being f. o. b. at said pier. The above facts regarding said shipments from the libelant's piers, not referred to in the opinion below, but appearing from the invoices and bills of lading relating to the shipments, indicate that delivery of all the coal so shipped to the Oil Corporation took place at the libelant's loading piers. In view of them, we do not think it can be taken as proved that the libelant delivered any of said coal to the Oil Corporation, under the above agreement for delivery, either at Promised Land or at Tiverton. But, even if such delivery can be taken as proved, there is no question that the coal included in the five cargoes was put on board the barges by the libelant at its New York piers without any understanding that it, or any definite part of it, was for either of the vessels libeled, or for any particular vessel of the fleet, or that all of it was for the vessels then composing the fleet. The first shipment, indeed, was expressly identified on the invoice as "coal for factory." There can be no doubt that, according to the understanding between the parties, some at least of the coal to be furnished would be needed in the factories, and the Oil Corporation was left, so far as any understanding with the libelant was concerned, to use the coal either in the factories or on the vessels of its fleet, as it might subsequently desire.

If the libelant can be said to have delivered any of the coal comprised in these five shipments to the Oil Corporation, at Promised Land or at Tiverton, there was still no understanding as to the coal so delivered, or any definite part of it, that it was for either of the vessels libeled, or for all of them, or even for all the vessels in the fleet, as distinguished from the factories; and, except that the coal was understood to be for use in its business as carried on at those places, its ultimate disposition was left as above for determination by the Oil Corporation subsequently to the making of the agreement regarding coal for the season, and subsequently to both its shipments and its delivery.

The five shipments were all charged by the libelant on its books to the Oil Corporation, without any entries charging any of it either to a specific vessel, or to specific vessels, or to the fleet; and they were billed to the Oil Corporation only, without any reference to vessels or fleet. When the first shipment to Promised Land arrived there, it was put into the Oil Corporation's bins, which already contained 1,068 tons previously received and paid for by the Oil Corporation in full, under the same general agreement. The remaining three shipments received at Promised Land were dumped on the same pile, and from the entire pile the Oil Corporation used coal as needed, for all the vessels in its fleet of nineteen, and also for running its boiler plant on shore at that place. The shipment received at Tiverton went upon the Oil Corporation's pier there, and was used by it in part for ten of the vessels belonging to its fleet as they needed it, and in part by its boiler plant on shore at that place. Among the vessels which took on board and used some part of the coal included in the five shipments were the vessels proceeded against in this case.

There was evidence tending to show how much coal each of said vessels took on board at Promised Land out of the entire stock at that place, and how much at Tiverton out of the entire stock there, after the five shipments had been received as above. The District Court determined the quantity of coal subsequently received and used by each vessel libeled, out of the coal included in said shipments, as follows: The respective quantities found to have been taken on board at Promised Land by each of said vessels respectively were reduced by an estimated proportion, being the proportion which the 1,068 tons in the pile at Promised Land, before the first of the above shipments to that place had been added thereto, bore to the whole quantity in said pile, after the coal included in said shipments had been added. To the quantities so ascertained were then added the quantities found to have been taken on board by each vessel libeled at Tiverton.

Whether the libelant has shown itself entitled to maritime liens upon these vessels respectively for the respective amounts of coal thus ascertained is a question to be determined, not between it and the owner at the time of said vessels, but between the libelant and the present claimant, who had nothing to do with the libelant's agreement with the Oil Corporation, nor with ordering, receiving, or using the coal shipped under it as above, and who did not become owner of said vessels until after they had received and used the coal. The Oil Corporation mortgaged its property in 1913, including these vessels, to secure its bonds. A bill to foreclose the mortgage so given had been filed in the same District Court wherein the decree now appealed from was rendered. There was a decree of foreclosure upon said bill, ordering the sale of the mortgaged property, and under it these and the other vessels of the fleet were sold April 24, 1915, before this suit was begun. The claimant was the purchaser of these vessels at the sale. The present libels were afterwards filed against them on June 16, 1915. While the sale did not divest valid maritime liens to which the vessels were subject when sold, the question of the validity of the liens asserted in this suit is, so far as the present claim is concerned, a question as to the validity of secret or unrecorded incumbrances.

As to the libelant's original agreement with the Oil Corporation to furnish it with coal for the season, it was never completely embodied in any written document. It appeared that when this agreement was made there was a balance due for coal from the previous year, and that the Oil Corporation was known to be largely indebted, in view whereof there was an understanding between the parties to the effect that the latter should have a maritime lien for the coal it was to furnish, not for the above five shipments specifically, and upon the Oil Corporation's entire fleet, or such vessels belonging to it as might thereafter use any of the coal, not upon any specific vessels included in it. The District Court found it to have been understood by the parties "that the law would afford a lien upon the vessels for the coal and that the Coal Company would thus have security," and also understood that "a large part of the coal furnished was to be used by vessels of the fleet."

[1] A contract cannot afford the necessary basis for a maritime lien, unless it is maritime in its nature, so as to be cognizable in admiralty; and it is not enough that the contract is maritime as to some of its provisions—it must be maritime in its entirety. It was long ago said by high authority:

"In cases of a mixed nature it is not a sufficient foundation for admiralty jurisdiction that there are involved some ingredients of a maritime nature. The substance of the whole contract must be maritime." Story, J., in Plummer v. Webb, 4 Mason, 380, Fed. Cas. No. 11,233.

The principle stated has since been repeatedly recognized and acted on. The following District Court decisions may be cited: Diefenthal v. Hamburg, etc., 46 Fed. 397, 399; Richard v. Hogarth, 94 Fed. 684; The James T. Furber, 129 Fed. 811; Id., 157 Fed. 128; Berton v. Tietjen, etc., Co., 219 Fed. 763—also the following decisions on appeal: The Harvey and Henry, 86 Fed. 657, 30 C. C. A. 330; Pacific, etc., Co. v. Leatham, etc., Co., 151 Fed. 440, 80 C. C. A. 670; The Pennsylvania, 154 Fed. 9, 83 C. C. A. 139:

[2] Nor, even if the libelant's agreement with the Oil Corporation had covered no coal for factory use, and had been an agreement only for the furnishing of such coal as the nineteen vessels of its fleet might thereafter require during the season, could it be regarded as maritime in character. It did not "begin and end in the necessities of a particular vessel for a particular vessel for her own voyage," as a contract for supplies must, in order to be within admiralty jurisdiction. "Where owners group together a large number of vessels, and make annual contracts for their supplies, the admiralty jurisdiction does not include them because the reason for it does not." The Oil Corporation could not, therefore, have sued the libelant in admiralty for failure to supply coal according to the agreement, nor could it have been sued in admiralty for a refusal to take and pay for coal offered under the agreement. Diefenthal v. Hamburg, etc. (D. C.) 46 Fed. 397, already cited; S. S. Overdale Co. v. Turner (D. C.) 206 Fed. 339.

Part of the agreement is said to have been that the libelant should have the security of a maritime lien for such coal as it should furnish thereunder. It may well be doubted whether, in a contract nonmaritime in character as above, a maritime lien for supplies later to be furnished could ever be created by express stipulation therein on the part of the vessel owner. It is at any rate clear, as pointed out in the opinion of the District Court, that no such security could be created upon the entire fleet, irrespective of what use should be made of the coal, nor upon particular vessels of the fleet for coal furnished to the other vessels. Astor, etc., Co. v. E. V. White, etc., Co., 241 Fed. 57, 154 C. C. A. 57, L. R. A. 1917E, 526. Whenever maritime liens created by express contract with the owner have been sustained, the agreed liens have been upon vessels or freights specified at the time of the agreement, and for supplies or advances then agreed to be furnished to them specifically upon such specific credit, and afterward so furnished. The evidence as to the precise agreement made in this case as to liens upon the Oil Corporation vessels is far from definite, and by no means such as would be sufficient in any event for the

establishment of a maritime lien by express consent of the owner. The general manager of the Oil Corporation testified that, as he understood, a maritime lien on the entire fleet should be security upon which the libelant was to furnish coal; but to such an agreement no effect can be allowed, as has been stated. We regard the evidence as establishing, at most, such an understanding as the District Court found to have existed—that "the law would afford a lien upon the vessels for the coal"; that is, according to the libelant's present contention, upon each vessel afterwards supplied, for the coal supplied to her.

Under the circumstances of this case, the libelant has a lien upon any one of these vessels, if it has proved that it "furnished" the coal received by her as above "to the vessel," upon the order of her owner, within the meaning of Act June 23, 1910, c. 373, 36 Stats. 604 (Comp. St. 1916, §§ 7783–7787), but not in the absence of such proof. This, under the circumstances shown, we consider the only lien which the law afforded it.

Assuming that the libelant can be said, in the case of any one of the vessels, to have "furnished to" her the coal she received, in the statutory sense, the furnishing may be said to have been "upon the order of her owner." But the question is whether any such assumption can be made, in view of the facts that, after turning over to the owner of the fleet the entire quantity of coal shipped as above, the libelant left it wholly to the owner to select, out of the fleet, the particular vessels by which the coal was to be received and used, and to determine the particular part of said quantity to be put on board each such vessel, as well as the particular time for putting it on board.

The federal statute enlarged the maritime law as it had previously stood, by permitting the acquirement of maritime liens upon vessels, for supplies furnished to them, as well in their home ports as in foreign ports. This it accomplished by providing that proof of furnishing such supplies to a vessel should be sufficient proof of credit given to the vessel therefor; definite proof of credit so given having always previously been held necessary, whenever what had been furnished had been furnished at the port of the owner's residence. We see no reason to believe that the statute intends the same result to be accomplished without proof that the supplies for which a lien is claimed have been furnished directly to the vessel, and not merely furnished to the owner without definite and distinct reference to her.

When the statute was passed in 1910, no principles of the maritime law of the United States were more fully recognized or more firmly adhered to than those set forth in the familiar statements by the Supreme Court in Vandewater v. Mills (The Yankee Blade) 19 How. 82, 89, 15 L. Ed. 554, to the effect that maritime liens are stricti juris, because they may operate to the prejudice of general creditors and purchasers without notice, and that they cannot be extended by construction, analogy, or inference.

It was also well settled, prior to the statute, that credit given by a materialman to a vessel was not proved unless supplies or materials intended for her were shown to have been furnished directly to her. While actual delivery by him on board, or (in the case of materials)

actual incorporation in the vessel, was not necessary under all circumstances to constitute such direct furnishing by him, mere delivery to the owner without special reference to the particular vessel, was not accepted as sufficient proof; there must have been at least such delivery to the vessel sought to be charged with a maritime lien as would have bound her under a contract of affreightment for transportation of the goods by her. See The James H. Prentice (D. C.) 36 Fed. 777, 781, and cases cited; The Vigilancia (D. C.) 58 Fed. 698, 700, and cases cited; The Cimbria (D. C.) 156 Fed. 378.

In like manner, it had been held necessary, in order to establish an admiralty lien upon a vessel for maritime services rendered to her, that the services should appear to have been rendered to the particular vessel sought to be charged. Proof that they had been rendered under a contract with her owner for future services to a number of his vessels indiscriminately, at an agreed price per day or for the season, though including the particular vessel, was not accepted as sufficient for the purpose. The Newport, 114 Fed. 713, 52 C. C. A. 415; The Alligator, 161 Fed. 37, 88 C. C. A. 201. In the latter case it was said by the Court of Appeals for the Third Circuit:

"A lien does not and should not attach for a supposed credit given to a vessel unless the services or supplies are clearly shown to have been rendered or furnished to the particular vessel to which the credit is given."

The statute of 1910 has not, in our opinion, made proof that the supplies for which a maritime lien is claimed were furnished directly to the particular vessel by the materialman any less necessary than before, nor does it afford any ground for attaching any meaning other than that previously recognized to the expression "furnished to a vessel." The decisions made since the statute was passed have insisted upon the same necessity and have given the same effect to the words quoted. See The Geisha, The Bethulia (D. C.) 200 Fed. 865, 876; Astor, etc., Co. v. White, etc., Co., 241 Fed. 57, 154 C. C. A. 57, L. R. A. 1917E, 526; The Cora P. White (D. C.) 243 Fed. 246.

The statute with which we are here concerned must thus be regarded as differing materially in its terms from state statutes purporting to give liens—which may or may not be maritime liens—for supplies or materials furnished "for" or "on account of" a vessel, or for materials furnished "in, or about, or during, her construction," like the Maine statute considered in The Kiersage, 2 Curtis, 421, Fed. Cas. No. 7,762, or the Massachusetts, Michigan, and Virginia statutes referred to in The Geisha (D. C.) 200 Fed. 865, 867, 868. In Berwind-White, etc., Co. v. Metropolitan, etc., Co. (C. C.) 166 Fed. 784, affirmed American Trust Co. v. W. & A. Fletcher Co., 173 Fed. 471, 97 C. C. A. 477, referred to in the opinion below, the Court of Appeals for this Circuit sustained liens claimed for machinery which had gone into each of two vessels respectively while being constructed, under a single contract to furnish machinery for both, but which did not appropriate any of it specifically to either. The liens so sustained, however, relating as they did to construction, were not maritime liens; nor were they asserted in an admiralty court. See 173 Fed. 480, 97

C. C. A. 477. The decision sustaining them, made in an equity suit, gave effect to a New Jersey statute with reference to which the machinery had been contracted for, which statute purported to secure by a lien any debt contracted by the owner of a vessel "on account of" any materials furnished "for or towards the building, repairing, furnishing or equipping such vessel." 166 Fed. 785. But the agreement here relied on must be taken to have had reference to the terms of the above federal statute, and the parties to have understood that "the law would afford a lien" upon any one vessel of the Oil Corporation fleet for such coal only as might be "furnished to" her according to the accepted meaning of that expression. The question here is whether compliance with the terms of that statute is proved, not whether any underlying equity can be found which might support a lien in the libelant's favor.

[3] We are unable to believe, in view of all the above, that the provisions of the statute can properly be understood in the less restricted sense accepted by the District Court, according to which, although the libelant had obtained no lien upon any vessel in the Oil Corporation's fleet when it parted with its coal by delivery to said corporation, liens in its favor might afterward be created by the Oil Corporation's subsequent acts in selecting particular vessels out of said fleet to receive portions of the coal which had been so delivered.

[4] Where specific supplies or materials have been furnished to the owner upon a distinct understanding that they were for a specified vessel, and the owner has, after delivery to him, appropriated them to the vessel so designated between the parties, they have been held to have been furnished to her in the sense of the statute; and maritime liens for them under it have been sustained. Ely v. Murray, etc., Co., 200 Fed. 368, 118 C. C. A. 520; The Yankee, 233 Fed. 919, 147 C. C. A. 593.

The Court of Appeals for the Third Circuit was careful, in the case last cited, to limit its decision as follows:

"We hold that a materialman may make actual delivery of supplies to a vessel in the maritime sense, by causing them to be transported by rail and water carriers by interrupted stages from their point of origin to the vessel side, when the transaction is begun by a valid order indicating that the supplies are for the vessel and are to be delivered to her, and is completed by an actual delivery to the vessel consistent with the instructions of the order and the intentions of the parties giving and accepting it."

Further than this no court had gone, in interpreting the provisions of the statute here in question, prior to the decision here appealed from. We are obliged to regard the construction adopted by the court below as one not intended by the statute.

We therefore hold that the District Court erred in sustaining the liens asserted, upon the evidence before it. This conclusion renders it unnecessary to consider certain other errors assigned.

The decree of the District Court is reversed, and the cases are remanded to that court, with instructions to dismiss the libels. The appellant in each case recovers its costs of appeal.