THE ALLIGATOR et al. THE ALLIGRIPPUS et al. THE PHŒNIX et al.

(Circuit Court of Appeals, Third Circuit. February 17, 1908.)

Nos. 34, 55, 56.

1. MARITIME LIENS—SERVICES RENDERED TO VESSEL—PRESUMPTION OF LIEN.

While there may be a maritime lien for services rendered to a vessel, either foreign or domestic, and there may be a presumption that such services were rendered on the credit of the vessel such as in case of salvage or pilotage services, whether such presumption arises, or whether the lien exists, depends on the nature of the services and the circumstances under which they are rendered.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens, § 12.]

2. TOWAGE—LIEN—WAITING UPON DREDGES.

The owner of a tug which was verbally hired by the day by the owner of three dredges to "wait upon" such dredges while engaged on certain work, the services rendered being the carrying of coal and water to the dredges, the towing of scows and of the dredges themselves when necessary is not entitled to a maritime lien on all or any of such dredges for a balance due on the contract which was not one for ordinary towage services to the vessels themselves.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Towage, § 9.]

3. MARITIME LIENS.

    A maritime lien does not attach for a supposed credit given to a vessel unless the service or supplies are clearly shown to have been rendered or furnished to the particular vessel to which the credit is given.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens, § 13.]

4. SAME—SUIT TO ENFORCE LIEN—STATE STATUTES.

    Although the admiralty courts will take judicial notice of state statutes creating liens they will not undertake to adjudicate rights thereunder in the absence of the allegations and proofs necessary to an issue and controversy in that behalf.

Appeal from the District Court of the United States for the District of New Jersey.

For opinion below, see 153 Fed. 216.

E. G. Benedict, for appellant.

Robert Carey, for appellee.

Before DALLAS, GRAY, and BUFFINGTON, Circuit Judges.

GRAY, Circuit Judge. These are appeals in three separate suits, one against each of the dredges named. The suits are identical, and it was stipulated by the prosecutors of the respective parties, that the testimony taken in one of the above cases should be used in each of the others. The libels and answers are substantially the same, and in the court below, as here, the cases were argued together. The facts, as found by the court below, are briefly as follows:

There was no written contract between the parties. The libelant owned the tug boat "Harold," which rendered the services for which claim is made in the libels. In the fall of 1904, he made a verbal contract with Thomas Potter, the owner of the dredges "Alligator," "Alligrippus," and "Phœnix," for the employment of his tug boat for general towing and waiting on the above-named dredges; the tug was to do whatever the captains of the dredges required, "such as getting coal and water, waiting on them in general, pumping scows and taking scows to them, and generally bring them away, and general work." The dredges had no motive power of their own. The price agreed upon for the services between the libelant and the owner of the dredges, was $20 per day. The libelant claims that the services rendered by him under the above-named contract, amounted in all to the sum of $5,370, of which sum there still remains due a balance of $2,820; that of said sum of $5,370, there was due from the "Alligator," for services rendered her $3,080, of which sum there has been paid on account $1,275, leaving $1,805 due; that from the "Alligrippus," there was due for like services rendered her, $2,060, of which $1,275 had been paid on account, leaving $785 due; and that from the "Phœnix," there was $230 due for like services. Payments on account were made by checks and notes, by Potter, to the order of the libelant. The payments were general, and without reference to the services rendered to any particular dredge, but they seem to have been arbitrarily applied by libelant, in the manner above stated.

The evidence on behalf of the libelant shows that the dates when the tug was engaged in the services of the dredges, were put down by

its captain in a book, which is said to have been subsequently stolen from the tug, and that reports had been made by the captain from this book, monthly or semimonthly, which original reports had been destroyed. Certain statements, however, testified to have been copies from them, were produced, and have been offered in evidence. They are nearly all in the general form of "Report of Tug 'Harold' " for a certain month, "Account Thomas Potter, waiting on dredges 'Alligator' and 'Alligrippus' at Ellis Island," followed by a short statement of services performed each day of the month, in carrying stores, water, and coal to the dredges, or towing dredges or scows, footing up a certain number of days. No specification for the services performed for each dredge is made. It was evident the account was afterward made out by multiplying the whole number of days in which the tug was engaged, by $20, and afterwards dividing the aggregate sum thus obtained into the portions charged arbitrarily against each of the three dredges respectively. The same arbitrary appropriation was apparently made of the partial payments by the owner of the dredges. Upon this showing, the libelant claims maritime liens upon the three dredges respectively, for portions of the balance due under his contract with the owner thereof.

It may be conceded at once that the dredges are to be considered in admiralty as "vessels," and as such, subject to the general maritime jurisdiction, and that the contract between the owner of the tug and the owner of the said dredges was a maritime contract. No claim is made, however, for the existence of a maritime lien against them, on the ground that they were other than domestic vessels. On the contrary, the learned counsel for the libelant contends, that the service was, so to speak, a technical towage service, and a necessary service, as rendered to vessels having no motive power of their own, and being clearly a maritime service, that there is, under the circumstances, a presumption that it was rendered on the credit of the vessels, and that by the admiralty law a lien for the value thereof attaches, and that the burden lies on the one who disputes the lien, to overthrow such presumption by satisfactory evidence. Moreover, it is contended that this presumption of lien exists independently of any question as to the foreign or domestic character of the vessels, and that in this respect the case differs from one in which there is a claim for a lien for supplies, where the question of domestic or foreign vessel becomes important, because, in the absence of a state statute or express agreement, there is no lien against a domestic vessel for supplies. We do not propose, nor is it necessary, to deny that there may be this general line of demarcation between claims for services and claims for supplies, with respect to the presumptions of liens arising therefor, or that generally a towage service is properly classified with a pilotage service, or with that of a seaman, and others, as to which there is a prima facie presumption of lien against the res to which the service was rendered. We must not, however, press too far such distinctions. They rest upon rules peculiar to the general admiralty law, as administered in the United States. This law imposes upon a vessel, as a consequence of certain situations and conditions, when established by evidence, the peculiar lien known as a maritime lien. Owing to the underlying

necessities of commerce, and to the wandering character of its great instrument, a ship, courts of admiralty will infer, in the absence of proof to the contrary, that, where supplies necessary for the accomplishment of the ship's voyage are furnished in a foreign port on the order of the captain of a ship, or the ship's agent, and even under some circumstances by the owner, they are furnished on the credit of the ship, and a lien for their value attaches by operation of law. In other words, these facts and conditions being proved, are held ground for the reasonable presumption of credit to the ship and a consequent lien. The same presumption is held to arise as to certain maritime services rendered to a ship, independently of its character as domestic or foreign.

The lien to which the ship is thus subjected, is created, not so much for the benefit of the creditor, but for the benefit of commerce. Merchants and others are thereby encouraged to furnish supplies and render services necessary to the continuance of the ship's voyage and to the commercial enterprise of which she is the instrument. In the United States, at least, these reasons for creating a lien in the absence of express contract, in judicial contemplation, cease to exist in the home port and with reference to a domestic vessel. The presumption, or rather the burden of proof, in such cases, therefore, is shifted, and when supplies are furnished to such a vessel, the burden is upon the furnisher, to show a mutual understanding that they were furnished on the credit of the vessel. As already observed, there are maritime services which are usually rendered under circumstances which make them so essential to the movement of a vessel, and to the performance of her primary function, as an instrument of commerce, that the admiralty law presumes they are rendered on the credit of the vessel, in the absence of proof to the contrary, and creates a maritime lien in their favor, independently of the question whether it be a domestic vessel, or not. Notable examples are the lien for pilotage services, the lien for seamen's wages, for towage services and for salvage services. The reasons for the rule in these cases are obvious, and arise out of the necessities of the situation. It would be an obstruction to commerce, as well as unreasonable, if a sailor were required to show a mutual understanding between himself and the captain, that there should be a lien upon the vessel for his wages, or that the pilot who goes over the ship's side as she approaches a port, or in a dangerous channel, should be called upon to show a like mutual understanding. So in the case of salvage, much of the world's wealth would be put in jeopardy, if the salvor could only claim a lien on the property saved, by showing a mutual understanding to that effect before the service was undertaken. The peculiar exigency of the situation in all these cases, supplies the reason for the rule of presumption of lien, as it has been long recognized in the administration of the general admiralty law. The exigency for such services, as are above enumerated, so generally exist, that the rule of presumption of lien is sometimes dissociated from the reason upon which it is founded. The service of a diver can be imagined as rendered under circumstances so exigent as to come within the reason of the rule of presumption of lien, as the service may have been necessary to prevent the immediate sinking of a vessel,

but the service of the same diver in examining a sunken wreck, or the bottom of a ship lying in port, to discover whether its general condition required that the ship should be docked, would come within a different rule. So a towage service, as ordinarily performed, is a maritime service, which from the peculiar situation of the parties and of the circumstances of necessity surrounding it, and in the absence of proof to the contrary, creates a presumption of credit given to the vessel and a consequent lien. But why, where the relation of the parties and the circumstances attending the performance of the service are different from those ordinarily obtaining, should this same rule of presumption apply? If the reason ceases, why should not the law cease? In the admiralty courts of the United States, the exemption of a domestic vessel from this rule of presumption of lien, rests entirely on the supposed absence of the reasons obtaining therefor in the case of a foreign vessel. Towage service in the present case was not one rendered under the ordinary conditions to which we have just adverted. There was no question of being in a foreign port, nor was there the ordinary exigency presented when a ship is to be towed into and from a harbor, or from place to place in a harbor, as a single service. It was not, therefore, a necessary service, in the sense in which that word is used in regard to the ordinary towage service, a service to be performed instantly, in order that a ship may not be delayed on her voyage, or in preparing for the same. The tug might be said to be part of the necessary equipment of the dredge, just as the scows were part of such equipment. It supplied a continuous motive power in the peculiar work for which dredges are built. It was a contract for what may be called a quasi towage service, made with the owner of certain dredges in the waters of New York Harbor, not for a single towage of the dredges from place to place, but a service which consisted of "waiting upon" the dredges, carrying supplies of water and coal to them, as occasion required, and the towing of the scows used in the dredging operations.

The towage of the dredges themselves are the least important part of the service. The contract between the owner of the tug and the owner of the dredges, was not for a single act of towage, but for a continued service, at a compensation to be paid by the owner, at so much per diem, and that service embraced other things than mere towage, being, as we have said, largely for "waiting upon" the dredges in the way of carrying coal, water, and other supplies from the shore to the dredges. It was, therefore, a mixed service in which, so far as towage was concerned, the towage of scows, not dredges, was that principally stipulated for. The service, therefore, was as different as possible from what is ordinarily called a towage service, as to which a presumption of lien obtains. The stipulated price of $20 a day, for "waiting upon" the dredges, indicates how different the conditions were from those which are considered as justifying a presumption of lien. The charges against the separate dredges were arbitrarily made upon statements of service, not to the dredges singly and separately, but, to them as grouped. It would be an abuse of the administration of the law of maritime lien, to decree a lien for services not clearly proved to have been entirely maritime and rendered to the par-

ticular res upon which the lien is claimed. A lien does not, and should not, attach for a supposed credit given to a vessel, unless the service or supplies are clearly shown to have been rendered or furnished to the particular vessel to which the credit is given.

It only remains to advert briefly to the last point urged by the appellant, viz., that even if the court should find that appellant's contention, that there was a true maritime lien in this case, is erroneous, still, under the statute of New Jersey, there was a lien for services of the kind in question, performed within the state, which an admiralty court will enforce.

The material parts of the statute referred to are as follows:

"That whenever a debt shall be contracted by the master, owner, agent, or consignee of any ship or vessel within this state, for either of the following purposes:

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"3. On account of the towing of such ship or vessel and the wharfage of such ship or vessel, and the expenses of keeping such ship or vessel in port, including expenses incurred in taking care of and employing persons to watch such ship or vessel; such debt shall be a lien upon said ship or vessel and the tackle, apparel and furniture, and continue to be a lien on the same until paid, and shall be preferred to all other liens thereon except mariners' wages."

Appellant makes this point for the first time in this court, and admits that this statute was not called to the attention of the court below. Conceding, for the sake of the argument, that libelant had a lien under the New Jersey statute, which could have been enforced in a court of admiralty, such lien was not asserted in the pleadings, or even alluded to in the proofs. It is true that, in a certain sense, a case in admiralty is heard de novo on appeal, but it is heard on the record as made in the court of first instance.

The allegations of the libels are very meager, and are only such as go to support the assertion of a maritime lien. There is not in them a single statement that would bring the cases within the terms of the state statute. Neither the residence of the libelant, nor the place where the service was performed, is directly or indirectly alleged to be in the state of New Jersey. It may also be added that no proof was offered by the libelant as to these matters, though it would have been immaterial if he had done so. Though courts will take judicial notice of state statutes, it is hardly necessary to say that they will not undertake to make rights under such statutes justiceable before them, in the absence of the allegata and probata necessary to an issue and controversy in that behalf.

The decree of the court below is affirmed.