In re 9,889 BAGS OF MALT.

RENKE v. HOWARD.

(Circuit Court of Appeals, First Circuit. November 19, 1919.)

No. 1422.

SHIPPING ⊜⇒154—LIEN FOR FREIGHT WAIVED BY UNLOADING AND STORING IN NAME OF CONSIGNEE.

Owner of a barge *held* to have lost his right to a lien for freight on a cargo which was unloaded at a wharf, and received and stored in the name of the consignee, without any agreement or understanding or knowledge on the part of the wharf owner that a lien was claimed.

Appeal from the District Court of the United States for the District of Massachusetts; Clarence Hale, Judge.

Suit in admiralty by Thomas J. Howard against 9,889 Bags of Malt; George T. Renke, claimant. Decree for libelant, and claimant appeals. Reversed.

Pitt F. Drew, of Boston, Mass., for appellant.

Richard H. Wiswall, of Boston, Mass. (Hill, Barlow & Homans, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. This case grew out of a libel against a cargo of malt to enforce an alleged lien in favor of the owner of the barge George S. Repplier for freight and demurrage accruing in connection with the transportation of the malt from Hoboken, N. J., to Boston.

The court below found that the libelant had performed his contract of carriage; that his maritime lien therefor had not been lost; and entered a decree for the libelant.

While several questions are raised on the record, the only one we find it necessary to consider and determine is whether the libelant retained his lien against the cargo. We think he did not, and that the libel must consequently be dismissed.

On July 12, 1917, Renke, the claimant and owner, had about 500 tons of malt on cars in Hoboken, which he had contracted to sell to one Logi in France. This he desired to have speedily transported to Mystic Wharf, Boston, in order to connect with the Moorish Prince, due to sail about 10 days later. Because of war conditions, he could obtain no assurance from the railroad company of transportation in season to connect with this steamer. Accordingly, he engaged one Elder, who was engaged in the lighterage business, to procure water transportation. Elder went to the firm of Gilmartin & Trundy, ship brokers, and through them contracted with the libelant, the owner of the barge, for the transportation of the malt. Howard was to furnish both barge and power; that it, towage for the trip. The malt was shipped in the name of W. H. Story & Co., commission merchants, who were financing Renke in the transaction.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

There is some conflict of evidence as to the degree of speed, or diligence in transportation, for which Howard contracted, and also as to whether he performed his contract. But our conclusion that the libelant lost his lien makes it unnecessary for us to consider and determine any questions arising concerning the contract or its performance. The action is in rem to enforce a lien; if there was no lien, the action fails.

The barge George S. Repplier was loaded on July 15. It, with three other barges, was taken in tow, and started on July 17. Delayed by fog, and because of the other barges, the cargo of malt finally reached Mystic Wharf on July 28, 8 days after the Moorish Prince had sailed, and 16 days after the claimant had made his contract with Elder. The barge was in charge of Capt. Gaffney. Renke seems to have been unknown to all the parties, except Elder, until he appeared in the case as claimant in October. The France & Canada Steamship Company was in control of this wharf, and one Akerley in charge thereof. The barge stayed at the wharf, loaded, for 6 days. Exactly what occurred during these 6 days the record does not show. After 6 days some one gave instructions that the malt should be unloaded on the wharf. Gaffney testified that he did not know why the cargo was not unloaded before; that he had nothing to do with unloading, and said nothing to the representatives of the France & Canada Steamship Company about this freight. In fact, the malt was taken out of the barge, apparently by Akerley's directions, and put in storage in a warehouse belonging to the Boston & Maine Railroad. Subsequently the railroad company and the steamship company both sought to maintain liens for their respective claims, originating in unloading and in storing the malt. These claims appear to have been paid by Renke's financial agent; the intervening petitions of the steamship company and the railroad company were accordingly dismissed. We find no evidence that, when this malt was discharged from the barge, Howard or any one in his behalf in any way, by word or act, indicated any purpose of claiming any lien thereon for freight and demurrage. Akerley testified to the effect that neither the captain nor the owner of the barge, or any one representing either of them, made any claim of a lien; that he had the malt put on the pier, so that it could go on some later ship; and then caused it to be stored in the name of Logi. After the cargo was discharged, controversies arose between the parties, both as to the time taken for the voyage and as to an alleged shortage in the malt delivery. Howard, who had been 25 years in this line of business, and must be presumed to be familiar with maritime liens, on August 8 threatened to "attach" the malt if his claim was not promptly paid. This threat to attach is, in our view, inconsistent with his even supposing that he had retained such constructive possession of the malt as to permit his maritime lien to survive. On August 15 he repeated his demand for payment of the freight and demurrage, but without asserting any claim to a maritime lien.

We do not think the evidence sustains the finding of the court below that "the malt was received by the France & Canada Steamship Company as a deposit for the benefit of both parties." The steamship

company seems to us to have taken possession of the malt because there was no one else to take possession of it, and without any notice, express or implied, from Howard or from any one in his behalf, of any claim of a continuing lien. The case does not, we think, fall within the principle laid down in Bags of Linseed, 66 U. S. (1 Black) 108, 114 (17 L. Ed. 35), cited by the court below. In that case, the court, by Chief Justice Taney, said:

"It is true that such a delivery, without any condition or qualification annexed, would be a waiver of the lien, because, as we have already said, the lien is but an incident to the possession, with the right to retain. But in cases of the kind above mentioned it is frequently, perhaps more usually, understood between the parties that transferring the goods from the ship to the warehouse shall not be regarded as a waiver of the lien, and that the shipowner reserves the right to proceed in rem to enforce it, if the freight is not paid. And if it appears by the evidence that such an understanding did exist between the parties, before or at the time the cargo was placed in the hands of the consignee, or if such an understanding is plainly to be inferred from the established local usage of the port, a court of admiralty will regard the transaction as a deposit of the goods, for the time, in the warehouse, and not as an absolute delivery, and, on that ground, will consider the shipowner as still constructively in possession, so far as to preserve his lien and his remedy in rem."

The evidence in this case utterly fails to show that "such an understanding did exist between the parties." This case has been frequently cited, and the doctrine enunciated in the above quotation consistently followed. None of the libelant's cases cited justify his claim, on the facts of this case.

The decree of the District Court is reversed, and the case is remanded to that court, with directions to dismiss the libel, with costs; and the appellant recovers his costs of appeal.