**WARRIOR TOMBIGBEE TRANSPOR-
TATION CO., INC., Plaintiff,**

v.

**5,775.674 NET TONS OF COAL, etc., in rem, Smith Coal Sales Company, in personam, and Abston Construction Company, Inc., in personam, Defendants.**

Civ. A. No. 82–0392.

United States District Court,
S.D. Alabama,
Civil (Maritime Claim) Division.

Sept. 16, 1983.

J.M. Druhan, D. Charles Holtz, Mobile, Ala., for plaintiff.

E.B. Peebles, III, Donald C. Radcliff, Mobile, Ala., for Southern Marine Service, Inc.

Joseph M. Allen, Jr., Gregory C. Buffalow, Mobile, Ala., Borden Martin Ray, Tuscaloosa, Ala., for Abston Const. Co. Inc., as owner of Coal.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL HOLCOMBE THOMAS, Senior District Judge.

This was a non-jury admiralty case involving an *in rem* action to enforce separate maritime liens arising out of towage services from Brookwood to Mobile, Alabama, supplied to four separate parcels of coal. There was a separate *in personam* action against Smith Coal Sales Company for unpaid accounts pertaining to towage of the four parcels (barges) of coal which were seized *in rem,* as well as various previous towage services supplied to Smith pursuant to a transportation agreement. An additional *in personam* action against Abston Construction Company, Inc. was later added, by amendment, for collection of an account for towage of the four barges from Mobile to New Orleans, which towage took place after the Writ of Discharge. There were also various *in personam* counterclaims based on the same transactions. The trial was conducted on December 19 and 20, 1982, and after a careful consideration of the testimony presented, depositions, documentary evidence and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

Abston Construction Company, Inc., Warrior Tombigbee Transportation Co., Inc. and Smith Coal Sales Company (hereinafter as Abston, Warrior and Smith), the parties to this lawsuit, are Alabama corporations and, at the times material to this lawsuit, were doing business within the State of Alabama and the jurisdiction of this Court.

The *in rem* defendants, four separate parcels (barges) of coal, were caused by plaintiff to be seized by the U.S. Marshal on April 20, 1982, while on board Warrior barges PV–183, AGS–339, PCBL–159 and

MEMCO–1. At that time the barges and coal were in the custody of Southern Marine Fleeting Service in Mobile, Alabama, and also within the jurisdiction of this Court. There were approximately 1,400 net tons of coal on each barge.

Abston is an Alabama coal mine operator and at all material times was engaged in supplying various quantities of coal, both directly to customers, and indirectly, through the use of brokers as middlemen.

Between April of 1981 and approximately March of 1982, Abston had such a brokerage arrangement with Smith by which Abston would sell coal to Smith "F.O.B. Barge" at Abston's loading facilities in Brookwood, Alabama. This was an oral agreement.

Pursuant to this arrangement, Smith, in turn, provided at its own expense, for the transportation of this coal it had purchased from Abston (and various other suppliers) to Smith's customers.

For purposes of this subsequent transportation from the Abston docks in Brookwood, Alabama, to Smith's customers, Smith primarily used two barge lines: Arrow Transportation Co. and the plaintiff herein, Warrior.

### Warrior's and Abston's Contracts with Smith

On April 1, 1981, a contract was entered between Warrior and Smith for the barge transportation of approximately 45,000 tons of coal per month from three different coal loading docks along the Alabama rivers to Mobile. The contract was scheduled to terminate on March 31, 1984. The rate per ton from Abston to Mobile was $5.55 per net ton. The contract called for demurrage at the rate of $150 per day per barge for the third through the seventh days after arrival in Mobile and $250 per day per barge thereafter.

A particularly important feature of the contract was paragraph "7" which reads: "Warrior Tombigbee shall be responsible for any loss of coal being transported for Smith. If any coal should be lost, Warrior

Tombigbee shall reimburse Smith for such coal at the F.O.B. loading point price at the time the coal was loaded onto the barge."

Also, Smith was obligated under the contract to pay the invoice amount upon receipt.

The Court finds that the contract language and surrounding transactions clearly show that Warrior, Smith and Abston considered that title to the coal passed from Abston to Smith at the time each barge was loaded.

There was nothing in the written contract specifically stating that Smith was obligated to pay fleeting and shifting charges. However, throughout the course of performance under this contract prior to Smith's falling behind on its payments to Warrior, Smith paid Warrior all fleeting and shifting charges billed to it.

During this same time period, Abston and Smith had an oral contract whereunder Smith had agreed to purchase all coal made available for Smith by Abston at the rate of $45.75 per ton. The coal was sold by Abston to Smith on credit, F.O.B. barge. No attempt was made by Abston to retain a security interest in the coal sold. In 1982, due to certain financial difficulties of its own, Abston required Smith to pay within approximately ten days of loading. Abston would usually send Smith invoices for coal loaded on board barges within three or four working days after loading and Smith would pay on its account by checks in round figures such as $75,000, $250,000 or $350,000. (Warrior Exhibit 46).

Whenever barges were presented at the Abston docks for loading, employees of Abston would operate the loading mechanism at the docks. No one from Warrior or the tugboats contracted by Warrior ever operated the loading mechanism. In addition, none of the Abston employees ever loaded any barges without prior authority from the Abston office. The person in the office who was primarily in contact with the loading docks was Abston's president, Philip Abston. If a barge was at the loading docks and no one at the docks knew of prior authority for loading the barge, someone

would contact the office to make sure that loading was authorized. Dock personnel were not permitted to simply rely on any statement by an employee of Warrior or the master of any tug in determining whether or not to load a barge.

Whenever barges were being loaded samples of the coal would be taken by Commercial Testing & Engineering Co. (Commercial), to determine the quality of the coal. The testing was done for the account of Smith, and not Abston.

Pursuant to Smith's arrangement with Abston, Smith would present either Warrior or Arrow barges for loading by Abston, from time to time and upon loading, the coal would be identified for Smith's account with Abston.

Both Abston and Smith testified that pursuant to their customary arrangement, payment for the coal was due Abston immediately upon loading. This was not made contingent on finalization of Smith's resale of the coal. Furthermore, payment would always come directly from Smith and not through Smith's customers.

As a broker, Smith did not purchase coal to be held in inventory. Instead, when the coal was loaded aboard barges, there was already a particular destination and customer of Smith in mind.

In early March or April of 1982, Smith suffered a serious business reversal and "lost its contract", that is, Smith suffered a termination of its contract to resell the coal it had been purchasing from Abston and other suppliers.

The exact date of this reversal could not be determined, but Smith indicated that it was in "the early part of March" when Smith last caused coal to be moved for customers. And as Smith estimated, it was able to pay its debts roughly up until March of 1982.

The four barge loads or parcels of coal which were the subject of the *in rem* Warrant of Arrest and seizure in this case, were onboard Warrior barges PV–183, AGS–339, PCBL–159 and MEMCO–1 (four Warrior barges). The coal on these barges was seized on April 20, 1982, and Abston filed an Appearance and Claim of Ownership on April 26, 1982. Following a hearing, Abston also posted a Special Admiralty Bond in the amount of $200,000.00 on May 18, 1982, in order to obtain the release of this coal.

The four Warrior barges containing the coal which was seized, were loaded with Abston coal at the Abston docks in Brookwood, Alabama, on March 11, 1982 (PV–183, AGS–339) and March 17, 1982 (PCBL–159, MEMCO–1). By the time the four Warrior barges were loaded, Smith, as above noted, was in financial difficulty and had lost its contract to resell the coal.

On learning of the mistake in loading the four Warrior barges with Abston coal (ostensibly for Smith), Smith signed a statement directed towards Abston to the effect that Smith did not have title to the four parcels of coal; that Smith did not authorize their being loaded and that it was not Smith's coal. Neither Abston nor Smith had issued a bill of lading, security interest or other document of title covering the coal.

Philip Abston, President of Abston Construction Company, Inc., testified at the trial of this case, that the purpose of Smith in writing such a letter to him was to assist Abston in its attempts to resell the coal. Abston further explained that P & O Falcoal, Inc., Abston's ultimate purchaser for the coal on the four Warrior barges, had also requested that Abston obtain such a letter to finalize Falcoal's agreement to purchase the coal.

The four barges arrived in Mobile, Alabama, in the latter part of March 1982. According to records identified by Mr. Richard Murray of Murray Stevedoring Company of Mobile, Alabama, the barges arrived on March 15, 1982 (PV–183, AGS–339) and on March 24, 1982, (PCBL–159, MEMCO–1). It is thus apparent from these undisputed dates that the four parcels of coal were towed in two separate flotillas. At any rate, by March 24, 1982, the four Warrior barges had arrived in Mobile and had been delivered by Warrior to the Southern Marine Fleeting area in Mobile, Alabama.

This facility was described as being a large "parking lot" for barges and other vessels. The Southern Marine Fleeting area was, in effect, a holding area where coal barges were customarily held until designated for delivery to consignees either by unloading at the pad space maintained by the Alabama State Docks or by unloading directly aboard oceangoing vessels.

At the time Warrior delivered custody of the subject four parcels (barges) of coal to Southern Marine, the coal remained laden onboard. Significantly, however, no documents produced at trial, or testimony of Warrior, or testimony of any of the witnesses, indicated that at the time of delivery to Southern Marine for temporary storage, Warrior specifically reserved the right to retain a lien against the coal, orally or otherwise. Instead, at the time of arrival in Mobile and delivery to Southern Marine, Smith gave telex instructions through its customary stevedore, Murray Stevedoring of Mobile, that the coal should be held pending its (Smith's) further discharging instructions.

As soon as Abston learned that Smith could not pay for the coal, it immediately undertook to find another purchaser for it. Abston also advised Warrior, at that time, in several telephone calls, that Smith's sale had fallen through and for that reason, that Abston was going to resell it. Abston also requested Warrior's assistance in finding a new purchaser and if this could be arranged, offered to utilize Warrior to push the coal to that purchaser. Warrior acquiesced to these arrangements.

The first of several telephone memoranda in Warrior's files which were identified at trial by Mr. Ron Brown of of Warrior and Mr. Ed Wall of Warrior, notes the following:

0845

3/30/82 Philip Abston called asked about the 8 barges of coal said he hadn't been paid for it. Wanted us to hold [and] find customer for it.

The eight barge loads of Abston coal so identified in Warrior's Memorandum (all of which were Warrior barges), were as follows:

MEMCO–1
PCBL–159
PV–183
AGS–339
MEM–107
PCBL–166
PCBL–141
AGS–367

The first four on this list contained the coal which was later seized.

Later that same day, on March 30, 1982, a similar file notation made by a Warrior employee at approximately 11:15, noted an Abston call which clarified that of the eight barge loads of coal on the above list, Abston had been paid for the last four barges only, that is, MEM–107, PCBL–166, PCBL–141 and AGS–367, but not for the first four, the four which Warrior later caused to be seized by the U.S. Marshal. In any event, Warrior noted on the memorandum: "We still hold all 8."

Later on, Warrior elected to release the Abston coal for which there was no doubt that Abston had been paid, then obtained a Warrant of Arrest for the coal on the four Warrior barges for which Abston had advised on March 30th that it had not been paid.

On April 19, 1982, Warrior was told for the first time by Smith that there was no hope of the latter paying Warrior. Even then Smith did not indicate that it might not be the owner of the coal. Therefore Warrior caused the seizure of the last four of its barges the next day, which were the only Warrior barges which were still under load.

The Marshal's arrest of the four parcels of coal occurred on April 20, 1982.

Abston had arranged to sell the coal thereon to P & O Falcoal of Houston, Texas. Abston had also advised Warrior of this and had arranged for Warrior to push these barges for Abston from Mobile to New Orleans, for Abston's account, for delivery to a vessel in New Orleans consigned to P & O Falcoal.

Following the issuance of the Writ of Arrest, and a post-seizure hearing on April 29, 1982, the amount of the Admiralty Bond required for the release of the coal was set on April 30, 1982, at $200,000.00. Abston filed a Claim of Owner for the subject coal and, as noted, on May 18, 1982, posted a Special Admiralty Bond in the amount of $200,000.00 for the release of it.

Thereafter, on May 18, 1982, a standard form Writ of Discharge was issued by the Clerk of the Court. This Writ, of which all parties were on notice, stated among other things, the following:

"You are, therefore, hereby directed to release said coal and deliver it to the Claimant thereof ... WITNESS the Honorable Daniel H. Thomas, Judge...."

Nevertheless, as noted in a subsequent Court Order dated May 21, 1982, following the Writ of Discharge, "Plaintiff Warrior Tombigbee Transportation Co., Inc., has refused to allow Defendant (sic) Abston Construction Company, Inc. to have possession of the coal...." (Court Order, May 21, 1982) It was, thus, several days after posting the Admiralty Bond, and not until the issuance of a second Court Order of May 21st that Warrior finally acquiesced to a release of the coal to Abston, as Claimant.

Abston then carried through its previously arranged sale of the coal to P & O Falcoal and as previously agreed, utilized Warrior to push the coal, still in the barges in which it had been initially loaded, to New Orleans. A dispute later arose as to the appropriate value of this Mobile to New Orleans towage of the coal on the four Warrior barges.

This dispute was due, in part, to the delays which were encountered in getting the coal to New Orleans due to the necessity of obtaining a second Court Order on May 21, 1982, before Warrior would consent to the release of the coal to Abston. Additional delays were encountered due to the necessity for pumping water out of barge MEMCO–1.

Warrior's initial invoice for this Mobile to New Orleans towage was for the total amount of $17,327.03. Abston subsequently paid this amount in full by check.

Abston caused a letter to be sent to Warrior along with this check which advised, in part, the following:

[W]e enclose herewith check no. 1874 from Abston Construction Co., Inc., on its account with the First Alabama Bank of Tuscaloosa, N.A. ... in the amount of $17,327.03. This represents complete payment of your charges for towage of the 5,777.674 net tons of coal aboard barges AGS–339, PCBL–159, MEMCO–1 and PV–183 to New Orleans, Louisiana, on or about May 25, 1982.

### Warrior's Post-Release Contract with Abston

Following the release of the barges on May 21, 1982, Warrior agreed with Abston to move the coal on the four barges from Mobile to New Orleans. Prior to moving the barges, Ron Brown of Warrior and Philip Abston orally agreed to the terms of the agreement. Following the telephone conversation, Ron Brown caused the following telegram to be wired to Philip Abston:

CONFIRMING OUR TELEPHONE CONVERSATION THIS DATE WARRIOR TOMBIGBEE TRANSPORTATION WILL TRANSPORT COAL IN BARGES PCGL159, MEMCO1, AGS339, PV183, TO RYAN WALSH BULK TERMINAL IN NEW ORLEANS LOUISIANA FOR $3 PER NET TON. ANY FLEETING AND SHIFTING INCURRED WILL BE FOR YOUR ACCOUNT. FREE TIME WILL BE 2 DAYS. DEMURRAGE WILL BE $150 OR THE FIRST 5 DAYS, $200 FOR THE NEXT 7 DAYS AND $250 FOR EACH DAY THEREAFTER. PAYMENT DUE WITHIN 10 DAYS OF BARGE ARRIVAL IN NEW ORLEANS, LOUISIANA. ADVISE BEFORE DEPARTURE OF BARGES FROM MOBILE IF ANY DISAGREEMENT WITH ABOVE TERMS.

This information was received by Abston before the barges left Mobile and no disagreement with any of the terms was made

known to Warrior at any time prior to the barges being discharged.

Shortly after the barges were unloaded in New Orleans, Warrior billed Abston $17,327.03 for freight, (i.e., towage), $1,500.00 for demurrage, and $2,586.12 for fleeting, tug assistance, shifting and pumping. Abston paid the freight (towage) charge, but refused to pay any other charges. Warrier subsequently agreed to delete the portion of the bill allotted to pumping, which left a total balance due of $3,524.00, which Warrior has claimed from Abston in its second amended complaint herein. Abston has not shown any reason for not paying this amount except for Philip Abston's assertion that he did not feel like it should be paid.

This claim against Abston for the disputed $3,524.00 pertaining to additional charges for the Mobile-New Orleans towage of the four barges, occurring after the Writ of Discharge, is the total *in personam* claim against Abston. Inasmuch as this *in personam* claim against Abston arose after the Writ of Discharge, it was not asserted against the Special Admiralty Bond.

The remainder of Warrior's claim, some $300,000.00, based upon the Transportation Agreement between Warrior and Smith, was filed *in personam* only as against Smith and *in rem* against the coal on the four seized Warrior barges. This was not asserted against Abston, *in personam,* nor could it have been inasmuch as it was based on the Transportation Agreement to which Abston was not a party.

Warrior's *in personam* claims against Smith have already been reduced to judgment by default in the amount of $323,237.88 on July 13, 1982, and therefore, require no further treatment by the Court insofar as concerns Smith's liability *in personam.*

With respect to the liability of the four barges of coal, *in rem,* due to the fact that the coal was seized prior to this default judgment and seized pursuant to Rule C, Supplemental Admiralty Rules (rather than by means of a Marshal's execution for enforcement of the judgment), and due to the fact that this coal, under the personification

doctrine, is a wholly separate entity and defending party in this action, the *in personam* judgment against Smith has no bearing on the existence of proof of facts constituting the basis for the existence or extent of a maritime lien against this coal. Instead, the factual bases for the lien, or liens, which have been asserted, must be analyzed separately.

Warrior's *in rem* claim is based on a series of towage services evidenced by a series of undisputed invoices—invoices which were submitted to Smith Coal Sales by Warrior between December of 1981 and April of 1982. This *in rem* claim also involved Warrior charges for towage services and charges for demurrage. Further, it appears that Warrior has asserted that the four parcels of coal pushed from Brookwood, Alabama, to Mobile, Alabama, in March and April of 1982, should be held liable for (a) the services rendered to the four parcels of coal at that time, as well as (b) other unpaid towage and demurrage claims against Smith, which arose pursuant to the Smith-Warrior Transportation Agreement, and which arose prior to the March and April transactions specifically involving the four Warrior barges and four parcels of coal.

The total claim for towage services (at the $5.55 contractual rate) provided to the four parcels of coal which were seized was $34,172.00. The total demurrage claim against these four parcels was $57,500.00.

The remainder of Warrior's claim did not pertain to services which had been provided to any of the four parcels or barge loads of Abston coal which were eventually seized.

When the subject coal was loaded for Smith on March 11 and 17, 1982, the price which Abston charged against Smith on Abston's records was $45.75 per net ton. As noted, this price was "F.O.B. Brookwood."

As the testimony of the Abston bookkeeper, Mrs. Judy Cox and Mr. Philip Abston indicated and as the Abston ledgers confirmed, the last payment for coal received by Abston from Smith was on March

8, 1982, and therefore, well prior to the loading of the four Warrior barges in question.

Following the eventual release of the coal by Warrior to Abston, Abston was able to resell it for $35.00 per net ton "F.O.B. New Orleans."

Just prior to trial on November 10, 1982, the Court ordered Warrior to post security on the Counterclaims of Abston, pursuant to Rule E, Supplemental Admiralty Rules. These counterclaims were based, in part, on the reduction in value of Abston's coal, which occurred during Warrior's alleged conversion and/or wrongful seizure of it. The amount of the Counter-Security so required by the Court was $75,000.00.

Warrior failed to post Counter-Security and instead, on November 19, 1982, asserted that it was financially unable to do so. In response, Abston questioned this alleged inability noting, among other things, that Warrior had never gone so far as to actually complete a bond application form with its insuror and never attempted to obtain such a bond by means of any guaranty or personal guaranty by its individual officers or shareholders.

Following Warrior's assertion of financial inability, Abston filed a Motion to Dismiss Warrior's *in rem* claims on November 23, 1982. The Court set this matter for hearing and following oral argument, took this matter under submission *pending* a more complete development at trial, of the various underlying facts. This Motion to Dismiss will also be treated in the Court's Conclusions of Law herein.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action and the parties pursuant to 28 U.S.C. § 1333.

■ 2. An individual or corporation who furnishes towage services for the transport of coal cargoes in barges, is entitled to a maritime lien against the cargo for the services rendered to it.

■ 3. Where towage services are furnished pursuant to contract or agreement, the furnisher of such services is also entitled to proceed against the contracting party in an *in personam* action without waiving its right to a maritime lien, 46 U.S.C. § 974.

4. The maritime lien for such services, however, attaches only to the particular *res* which received the benefit of the services. *The Alligator*, 161 F. 37, 41–42 (3 Cir.1908). *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920).

■ 5. Thus, in cases such as this where towage services which give rise to maritime liens, are shown to have been rendered to a number of separate parcels or barge loads of coal, each parcel, or *res,* can be held responsible only for its *pro rata* share, *The Transmarine Barge No. 100,* 62 F.2d 252 (2 Cir.1932), that is, only for the services actually provided or reasonably attributable to it. *The Alligator, supra.*

6. For that reason, in this case, Warrior can only recover from the coal *in rem* for the reasonable value of the towage services actually provided or supplied to each of the four parcels of coal which were seized.

■ 7. Abston sold the coal "F.O.B. barge," according to the testimony of Philip Abston. In other words, Abston completed its performance and delivery to Smith as to any particular bargeload of coal at the time the coal was loaded into the barge and Smith became obligated for the agreed price of the coal at that time. Ala.Code § 7–2–319(1)(a) and (c) (1975).

■ 8. Since Abston's performance was complete upon loading, title passed at that time. Ala.Code § 7–2–401(2). The pertinent portion of that statute is as follows:

*Unless otherwise explicitly agreed* title passes to the buyer *at the time and place at which the seller completes his performance with reference to the physical delivery of the goods,* despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place, . . . .

(Emphasis added)

Thus, the only thing that could prevent title from passing when the coal was loaded into the barges would be an explicit agreement to the contrary.

9. As can be seen from the above findings of fact, there was not even an implied agreement to the contrary, much less an explicit agreement. The only explicit agreement as to when title passed was the agreement that the coal was being sold "F.O.B. barge." This indicates that the parties intended title to pass when the coal was loaded into the barges.

■ 10. Another provision of the Alabama UCC also shows that Smith's obligation to pay for the coal arose when the coal was loaded into the barges. Section 7–2–507(1) of the Alabama Code states:

> Tender of delivery is a condition to the buyer's duty to accept the goods and, unless otherwise agreed, to his duty to pay for them. *Tender entitled the seller to acceptance of the goods and to payment according to the contract.*
>
> (emphasis added)

Abston tendered the coal upon loading, and became entitled to payment according to the contract at that time. As shown in the findings of fact, Smith was purchasing on a credit basis, and therefore "payment according to the contract" meant that Abston was due to be paid within a few weeks after each barge was loaded.

11. Abston's primary argument against Warrior's position that title to the coal passed to Smith when the barges were loaded is made on the basis of section 7–2–705 of the Alabama Code of 1975. There are several reasons based upon the statute itself, that section 7–2–705 did not reinvest title in Abston in the present case.

■ 12. The statute gives the right to stop "delivery". Obviously, in order to stop "delivery", it is imperative that the goods not yet be delivered. As has been shown above, the coal was sold "F.O.B. barge". The pertinent portions of section 7–2–319 of the Alabama Code of 1975, which defines the term, "F.O.B.", is as follows:

(1) Unless otherwise agreed the term F.O.B. (which means "free on board") at a named place, even though used only in connection with the stated price, is a *delivery* term under which:

(a) When the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided in this article (section 7–2–504) and bear the expense and risk of putting them into the possession of the carrier; or

.    .    .    .    .

(c) When under either (a) or (b) the term is also F.O.B. vessel, car or other vehicle, the seller must in addition at his own expense and risk load the goods on board.

.    .    .    .    .

(3) Unless otherwise agreed, in any case falling within subsection (1)(a) or (c) or subsection (2), the buyer must seasonably give any needed instructions for making delivery, including when the term is F.A.S. or F.O.B. the loading berth of the vessel, and in an appropriate case its name and mailing date. The seller may treat the failure of needed instructions as a failure of cooperation under this article (section 7–2–311). He may also at his option move the goods in any reasonable manner preparatory to *delivery* or shipment.

(emphasis added)

Based upon this, it is clear that "delivery" was made as to two Warrior barges on March 11, 1982, and as to two others on March 17, 1982. Thus, it was impossible for "delivery" to be "stopped" any time after the coal was loaded onto the barges. The section on stoppage of "delivery" clearly speaks of "delivery" between the "seller" (Abston) and the "buyer" (Smith), and not between the buyer (Smith) and the person who buys from Smith. Ala.Code § 7–2–705 (1975). The only delivery which was not completed was delivery by Smith to *its buyer.*

13. Furthermore, section 7–2–705 does not work in Abston's favor as noted in the specific parenthetical reference in that sec-

tion to section 7–2–702 of the same code. The pertinent portions of the latter statute are as follows:

(1) Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash, including payment for all goods theretofore delivered under the contract, and stop delivery under this article (section 7–2–705).

(2) Where the seller discovers that the buyer has received goods *on credit* while insolvent he may reclaim the goods upon demand made *within 10 days* after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the 10-day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay.

(emphasis added)

■ 14. As noted previously, Abston was selling the coal to Smith for $45.75 per ton. Therefore, Abston is estopped to deny that the value of the coal was any less than this. In addition, Warrior was receiving $5.55 per ton for freight from Abston to Mobile. These figures should be added to determine the value of the coal onboard the barges in Mobile. The sum, $51.30, should be multiplied by the number of tons on the barges, 5,775.674. The result is $296.297.07. The Court finds that this is the price at which the coal would have sold had the June 2, 1982, sale taken place.

### Warrior's In Personam Claim Against Abston

■ 15. As to Warrior's *in personam* claim against Abston, Warrior has proven a contract according to the terms of the May 21, 1982, telegram from Ron Brown of Warrior to Philip Abston. Warrior performed as required under contract, but Abston failed to pay the amounts due except for freight (towage), and showed no just cause for failure to pay. Therefore, Warrior is entitled to recover $3,524 from Abston, in addition to the above stated amounts.

■ 16. It is clear that Warrior's maritime lien claims for towage services to coal other than the four barge loads which were seized, have been forfeited. This is because the record is totally devoid of any showing that any of this previously serviced coal was retained for enforcement of the possessory maritime lien and, significantly, because there was no showing whatsoever that this previously towed coal was unloaded with an agreement or clear reservation of a claim of lien. *See In Re 9,889 Bags of Malt,* 262 F. 946 (1 Cir.1919).

In accordance with the foregoing, the Court finds that the plaintiff has suffered damages in the amount of $91,672.00, $34,-172.00 of said total being attributable to the towage claim of the four barges noted in this litigation and $57,500.00 being attributable to the demurrage claim with respect to said barges, for which recovery is due on the *in rem* claims. The Court further finds that the plaintiff has suffered damages in the amount of $3,524.00 which is due from Abston *in personam.*

■ The Court further finds that Southern Marine Service, Inc., is entitled to recover from plaintiff, Warrior Tombigbee Transportation Co., Inc., the value of its services as substitute custodian of the coal while the coal was under seizure. The Court finds that the reasonable value of these services is $3,486.25.

A Judgment will be forthwith entered in accordance with the foregoing Findings of Fact and Conclusions of Law.